UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION AT LEXINGTON
CASE NO: _____

*Electronically Filed*

ALI SAWAF, Individually,                                    PLAINTIFF
and as the Administrator of the
Estate of MARK S. SAWAF, Deceased

VS.

LEXINGTON-FAYETTE URBAN                                      DEFENDANTS
COUNTY GOVERNMENT
      Serve:        Hon. Janet M. Graham
                Commissioner of Law
                LFUCG City Hall
                200 East Main Street
                Sixth Floor
                Lexington, Kentucky 40507

and

BRAD DOBRZYNSKI, *Individually,*
Lexington Fire Department
Station 1
219 East 3rd Street
Lexington, Kentucky 40508

and

MATT GREATHOUSE, *Individually,*
Lexington Police Department
150 East Main Street
Lexington, Kentucky 40508

and

CLAYTON ROBERTS, *Individually*
Lexington Police Department
150 East Main Street
Lexington, Kentucky 40508

and

UNKNOWN EMPLOYEES of the LEXINGTON-
FAYETTE URBAN COUNTY GOVERNMENT DIVISION
of POLICE and FIRE DEPARTMENT/ PUBLIC SAFETY, *Individually,*
> Serve:       **Hon. Janet M. Graham**
> **Commissioner of Law**
> **LFUCG City Hall**
> **200 East Main Street**

and

ANY AND ALL UNKNOWN DEFENDANTS

---

## COMPLAINT

COMES NOW the Plaintiff, ALI SAWAF, Individually, and as Administrator for the Estate of MARK S. SAWAF, Deceased, by and through counsel, and for the Claims and Causes of Action against the Defendants herein, does hereby state as follows:

### INTRODUCTION

1.   This is a claim for monetary damages under 42 U.S.C. Section 1983 and under the statutes and common law of the State of Kentucky against Defendants, Lexington-Fayette Urban County Government and Defendant employees of Lexington-Fayette Urban County Government.

2.   Additionally, Plaintiff, ALI SAWAF, brings this Complaint, Individually and as Administrator of the Estate of MARK S. SAWAF, deceased, for the wrongful death of MARK S. SAWAF as well as for loss of filial consortium on behalf of ALI SAWAF.

### JURISDICTION AND VENUE

3.   This claim arises under the Untied States Constitution, particularly under the provisions of the Fourth, Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution, and under Federal law, including the Civil Rights Act, Title 42, United States Code Sections 1983, 1985 and 1988.

4.   This Court has jurisdiction over this case under the provisions of Title 28, United

States Code Sections 1331 and 1343.

5.      This Court also has supplemental jurisdiction to consider the Plaintiff's pendant

state law claims, which arise out of the same set of facts and/or controversy as set forth herein

below pursuant to Title 28, United States Code Section 1367.

6.      Venue is proper in the Eastern District of Kentucky, Lexington Division, pursuant to

28 U.S.C. Section 1391(b)(1), as it is believed that the vast majority of Defendants reside in the

Eastern District of Kentucky, Lexington Division.

7.      Pursuant to the Seventh Amendment of the United States Constitution, Plaintiff

requests a jury trial on all issues and claims set forth in this Complaint.

PARTIES

8.      Plaintiff, ALI SAWAF, Individually, and as Administrator for the Estate of MARK

S. SAWAF, Deceased, hereby adopts and incorporates by reference the Complaint, as if fully set

forth herein.

9.      Plaintiff, ALI SAWAF, Individually, and as Administrator of the Estate of MARK S.

SAWAF, Deceased, is and was at all relevant times hereto a resident of Fayette County,

Kentucky and became the duly appointed Administrator of the Estate of MARK S. SAWAF on

October 18, 2016;

10.     Defendant, LEXINGTON-FAYETTE URBAN COUNTY GOVERNMENT,

(hereinafter LFUCG), is and was at all times relevant hereto a city organized under the laws of

the Commonwealth of Kentucky whose agent for purposes of service of process is the Hon. Janet

M. Graham, Commissioner of Law, LFUCG City Hall, 200 East Main Street, Sixth Floor,

Lexington, Kentucky 40507;

11.     Defendant, BRAD DOBRZYNSKI, (hereinafter DOBRZYNSKI) was at all times

relevant hereto an employee of the Lexington Fire Department, assigned to the Fire Investigation Bureau and operating in the capacity as and under the authorization and authority given him as an employee of the LFUCG;

12.    Defendant, MATT GREATHOUSE, (hereinafter GREATHOUSE) was at all times relevant hereto an employee of the Lexington Police Department, a bomb technician with Lexington Hazardous Devices Unit and operating in the capacity as and under the authorization and authority given him as an employee of the LFUCG;

13.    Defendant, CLAYTON ROBERTS, (hereinafter ROBERTS) was at all times relevant hereto an employee of the Lexington Police Department, assigned to the Hazardous Devices Unit and operating in the capacity of and under the authorization and authority given him as an employee of the LFUCG. On the date of the incident which is the subject of the above styled action (hereinafter "the incident") (August 11, 2016), ROBERTS was further acting in a supervisory capacity to Defendants DOBRZYNSKI and GREATHOUSE.

14.    Defendant, LFUCG, administers, operates and funds the Lexington-Fayette Urban County Government Division of Police, Lexington Fire Department and/or Department of Public Safety (hereinafter LFUCG Div. of Police/Fire).

15.    Defendant(s), UNKNOWN EMPLOYEES of the LFUCG Div. of Police/Fire were at all times relevant hereto operating in the capacity as and under the authority given them as employees of the LFUCG.

16.    ALL officers, police and/or fire, employed by the LFUCG Div. of Police/Fire are employees of the Defendant, LFUCG;

FACTS

17.    On August 11, 2016, several officers/employees of LFUCG, including Defendants

DOBRZYNSKI, GREATHOUSE and ROBERTS, assisted agents from the Bureau of Alcohol Tobacco and firearms (hereinafter ATF) with a special detail in Harlan County, Kentucky.

18. Members of multiple agencies including the ATF, Kentucky State Police (hereinafter KSP), Lexington Police Department and Lexington Fire Department, participated collectively in that special detail as part of a task force.

19. The task force was divided into teams.

20. Defendant ROBERTS was the supervisor of "team two" which also included Defendants DOBRZYNSKI and GREATHOUSE.

21. On the date of the incident, Defendant DOBRZYNSKI was an employee of the Lexington Fire Department, assigned to the Lexington Hazardous Devices Unit. The Lexington Hazardous Devices Unit had requested him to assist on the special detail as a medic.

22. On August 10, 2016, (the evening prior to the detail) Defendant DOBRZYNSKI obtained the authority, express consent and permission to participate on the detail from a Captain of the Fire Investigation Bureau. That Captain also contacted "Chief Sweat" who additionally gave him (DOBRZYNSKI) authority, express consent and permission to participate.

23. On the date of the incident, Defendant DOBRZYNSKI's involvement with the special detail was strictly as a medic.

24. On the date of the incident, Defendant DOBRZYNSKI had only been assigned to the Hazardous Devices Unit for approximately 4 months.

25. Defendant DOBRZYNSKI gave a statement to KSP Sergeant Jason Joseph on August 18, 2016, in which he related that he "tries " to attend the Hazardous Devices Unit's bi monthly training sessions.

26. The date of the incident would mark the very first time ever in his career Defendant

DOBRZYNSKI had participated in an out of town task force special detail.

27.    On the date of the incident, Defendant DOBRZYNSKI had no prior military service.

28.    On the date of the incident, Defendant DOBRZYNSKI, had no prior law enforcement experience and had only recently graduated from the Lexington Police academy in May of 2016.

29.    On August 10, 2016, the date before the incident, Defendant DOBRZYNSKI worked his shift from 7a.m. to 11:00p.m. (16 hours), then was called to a fire at 11:00p.m. at which time he worked another four and a half to five hours before returning home and going to bed around 3:30a.m. to 4:00a.m on August 11, 2016. At that point he had worked approximately 20 ½ to 21 hours.

30.    On August 11, 2016, Defendant DOBRZYNSKI began his day at 6:45 a.m. at which point he worked another 12 consecutive hours. By 6:45p.m. on August 11, 2016, Defendant DOBRZYNSKI had worked approximately 32 ½ hours of the last 35 ½ hours. Having only 2.5 to three hours sleep during that time.

31.    At 6:45p.m., on August 11, 2016, as MARK S. SAWAF lay on the ground on his left side in a fetal position, with his hands cuffed in front of him and those cuffs further attached to a belly chain which was secured around his waist, Defendant DOBRZYNSKI stood over top of MARKS S. SAWAF and from a distance of four to five feet then shot MARK S. SAWAF in the top (back) of the head with his (DOBRZYNSKI'S) .40 caliber service pistol.

32.    Defendant DOBRZYNSKI later related to KSP Sergeant Jason Joseph that at the sound of the shot, Defendant GREATHOUSE'S immediate verbal response was "Fuck, that was loud!"

33.     Defendant GREATHOUSE then apathetically quipped "Nice shot".

34.     Defendant GREATHOUSE then asked/suggested that someone take a photo to depict what would later be alleged was the positioning of MARK S. SAWAF's body in relation to that of Defendant GREATHOUSE.

35.     Using his cell phone, Defendant DOBRZYNSKI then took several photos from different angles of Defendant GREATHOUSE striking different poses with the body of MARK S. SAWAF.

36.     Those photos depicted the handcuffed hands of MARK S. SAWAF cupped around the top of Defendant GREATHOUSE'S holstered pistol as Defendant GREATHOUSE knelt by the body of MARK S. SAWAF.

37.     Defendant ROBERTS did not witness the shooting, but was extremely close by at the time which it occurred. He could hear the actors present speaking and the report of the shot.

38.     Defendant ROBERTS arrived at the scene of the shooting in time to witness Defendant DOBRZYNSKI taking the cell phone photos.

39.     Those photos taken by Defendant DOBRYNSKI would be the only known photos taken of MARK S. SAWAF at the scene of the shooting.

40.     Although, under belief of Plaintiff, Defendant ROBERTS also had EMT training, Defendant DOBRZYNSKI was there for the express purpose of acting strictly as a medic, and as a police officer Defendant GREATHOUSE had a duty to render aid, after the photos were taken all three Defendants stood at the scene for approximately the next twenty minutes and did nothing to render aid to MARK S. SAWAF as he clung to life and struggled to breath.

41.     It wasn't until ATF Medic Rebecca Bobbich arrived on the scene approximately twenty minutes after the shooting that anyone even checked MARK S. SAWAF for any signs of

life.

42. Upon her arrival at the scene at approximately 7:05p.m., Medic Bobbich immediately observed that MARK S. SAWAF was breathing. She could see his chest rising and falling. This would have been obvious to any casual onlooker and required no special training.

43. Defendant ROBERTS then began assisting Medic Bobbich in performing life saving efforts on MARK S. SAWAF.

44. MARK S. SAWAF was pronounced dead by members of the Harlan County EMS at 8:00p.m. on August 11, 2016.

45. A death investigation into the shooting was initiated immediately by members of KSP Post 10 in Harlan, Kentucky.

46. At approximately 8:38p.m. KSP Sergeant Jason Joseph and KSP Lieitenant Randy Surber arrived near the location where the shooting occurred to begin investigating.

47. Upon learning that Defendant DOBRZYNSKI had been the individual that had actually shot MARK S. SAWAF, Sgt. Joseph asked him if "..he could tell me a little bit about what happened."

48. Defendant DOBRZYNSKI then advised Sgt. Joseph, "he did not want to give a statement at that time."

49. Sgt. Joseph then assured Defendant DOBRZYNSKI that he wouldn't take a formal statement for several days and that he "just needed to get some initial information."

50. Defendant DOBRZYNSKI then stated to Sgt. Joseph, "I've just been involved in a shooting and I don't wish to give a statement at this time."

51. Based on that statement, Sgt. Joseph did not ask Defendant DOBRZYNSKI any further questions at that time.

52.     Although Defendant DOBRZYNSKI would later rely heavily on the cell phone photos he took of MARK S. SAWAF allegedly still holding onto Defendant GREATHOUSE's holstered weapon after the shooting to allege he shot MARK S. SAWAF in self defense, he did not advise Sgt. Joseph of the photos when initially approached by him (Joseph) as described above. Defendant DOBRZYNSKI also did not provide Sgt. Joseph with his cell phone for preservation of evidence which he could have done at that time without giving Sgt. Joseph any verbal statement.

53.     According to Sgt. Joseph's investigation into the incident, "the scene was very chaotic. Lt Surber and I had difficulty getting the officers to stand still to answer very basic questions."

54.     Sgt. Joseph then approached ATF agent Todd Tremain who had been present at the shooting when Defendant DOBRZYNSKI had shot MARK S. SAWAF.

55.     Sgt. Joseph asked agent Tremain if he had been involved in the shooting. Agent Tremain advised Sgt. Joseph. "..he was."

56.     Sgt. Joseph then asked Agent Tremain, "...if he remembered how many shots had been fired."

57.     According to Sgt. Joseph's investigation, Agent Tremain, "...then shrugged his shoulders and walked off without any other acknowledgment of the question."

58.     At approximately 9:23p.m., Sgt. Joseph received a call from Special Agent Bob Findlay from the ATF Force Review Branch. Agent Findlay asked Sgt. Joseph for an update on the progress of the investigation.

59.     Sgt. Joseph informed Agent Findlay. "...that it was somewhat confusing and that we had received little initial cooperation."

60.  Agent Findlay assured Sgt. Joseph that this was not normal and he would address the issue when he arrived in Harlan (from Nashville, TN).

61.  Lt. Surber then informed Sgt. Joseph that there may have been a photograph taken of the scene immediately after the shooting by Defendant DOBRZYNSKI.

62.  Lt. Surber had learned of the photo only after an ATF agent had revealed it to him.

63.  Defendant DOBRZYNSKI had deliberately concealed the fact he had taken the photos from KSP Sergeant Joseph.

64.  Defendants GREATHOUSE and ROBERTS had also not divulged the existence of the photos to KSP investigators.

65.  Sgt. Joseph then attempted to locate Defendant DOBRZYNSKI only to discover that Defendants DOBRZYNSKI, GREATHOUSE and ROBERTS had all three "left the area without formally notifying any of the investigating officers."

66.  Sgt. Joseph then received information as to their whereabouts. Sgt. Joseph advised KSP Detectives Bryan Johnson and Jake Wilson to go and locate those officers.

67.  When KSP Detectives Johnson and Wilson located Defendants DOBRZYNSKI, GREATHOUSE and ROBERTS, it was confirmed that Defendant DOBRZYNSKI had in fact taken some photos.

68.  Detective Wilson reported back to Sgt. Joseph that he had been able to obtain the phone but there was an issue with taking the phone into evidence and he had received feedback from Defendant ROBERTS regarding the issue.

69.  Defendant ROBERTS was opposed to allowing the cell phone to be taken from Defendant DOBRZYNSKI.

70.  Defendant DOBRZYNSKI apparently had issue as well with allowing the contents

of the cell phone to be accessed.

71.    At approximately 1:30 a.m. on August 12, 2016, an attorney employed by the city of Lexington, Kentucky arrived at KSP Post 10 and approved a consent to search form for Defendant DOBRYNSKI to sign which would allow KSP investigators to access the photos from his cell phone.

72.    Defendant DOBRZYNSKI agreed to give consent only after the attorney amended the consent form to restrict the KSP investigator's search of Defendant DOBRZYNSKI's cell phone to only the photos taken on August 11, 2016.

73.    It is unknown to Plaintiff what texts or other communications Defendant DOBRYNSKI may have made immediately following the shooting to any other individuals using his cell phone.

74.    On August 18, 2016, one week after the incident and represented by two attorneys which were also present, Defendant DOBRZYNSKI gave an audio recorded interview to KSP Sgt. Jason Joseph.

75.    During that interview he advised Sgt. Joseph that on the date of the incident, he and Defendant GREATHOUSE were escorting MARK S. SAWAF up a mountain. DOBRZYNSKI alleged it was at that time that MARK S. SAWAF attempted to grab the holstered weapon of Defendant GREATHOUSE.

76.    Defendant DOBRYNSKI advised it was then that he observed Defendant GREATHOUSE attempting to retain the weapon in the holster as ATF agent TODD TREMAIN delivered strikes to MARK SAWAF.

77.    Defendant DOBRZYNSKI then explained to Sgt. Joseph that during the alleged altercation between MARK S. SAWAF, Defendant GREATHOUSE and ATF agent Tremain

(who was unarmed and attempting to use non lethal force), that he (DOBRZYNSKI) stood and watched the trio without assisting in any way whatsoever until such time that Defendant GREATHOUSE yelled for him (DOBRZYNSKI) to shoot MARK S. SAWAF.

78. Defendant DOBRZYNSKI advised it was then that he shot MARK S. SAWAF one time in the top of the head.

79. At no time during the alleged attempt by MARK S. SAWAF to obtain Defendant GREATHOUSE's weapon, did the weapon ever leave Defendant GREATHOUSE's holster.

80. It is unknown to Plaintiff whether Defendant GREATHOUSE's Holster was equipped with a retention device.

81. Defendants GREATHOUSE and ROBERTS were also interviewed August 18, 2016 by Sgt. Joseph and with the assistance of counsel.

82. During his interview by KSP Detective Josh Howard, Defendant ROBERTS related that it was only "moments" after the shooting before ATF Medic Bobbich arrived and began life saving procedures on MARK S. SAWAF.

83. According to the time line of events kept by ATF Agent Russel King, approximately 20 minutes expired before Bobbich began treating MARK S. SAWAF.

84. On August 16, 2016, Detective Jake Wilson interviewed Officer Edward Joseph Duerson of the Lexington Police Department.

85. During the interview, Officer Duerson, who was also assigned to assist the task force, advised he was part of the (Lexington) team as well, but that he had not been present at the time of the shooting, because he was "tired and hungry" and elected not to accompany the team to the location where the shooting would later occur.

86. All Defendant Officers who were interviewed on August 18, 2016, had counsel

present.

87.  Before MARK S. SAWAF was shot in the back of the head while in restraints by Defendant DOBRZYNSKI and then denied medical treatment by all Defendant Officers, his attorney, Travis Rossman, had advised task force members that he had a duty and wanted to accompany MARK S. SAWAF every step he took with them on the date of the incident. However, Travis Rossman was refused the right to do so.

88.  During the interviews conducted on August 18, 2016, none of the Defendant officers gave any explanation as to why they had not provided any medical assistance or assesed MARK S. SAWF for signs of life immediately after the shooting.

89.  The Defendant officers at no time gave an explanation as to why, if they believed MARK S. SAWAF deceased at the time of the shooting, that the Harlan County Coroners office was not contacted at that time as required by Kentucky Law (KRS 72.020).

90.  Although MARK S. SAWAF was not pronounced dead by the Harlan County EMS until 8:00p.m., according to an interview of his attorney, Travis Rossman, by KSP Detective Jake Wilson, by 7:30p.m. the U.S. Attorney's office had already notified Rossman (via voice mail) that MARK S. SAWAF was dead.

91.  Harlan County Coroner, Phillip Bianchi, was not notified of the death until 8:15p.m.

92.  When Coroner Bianchi arrived to claim the body of MARK S. SAWAF, personnel at the scene suggested the restraints be removed from the body.

93.  Coroner Bianchi insisted the restraints not be removed so that the circumstances and condition of the body be preserved to maintain the integrity of the evidence.

94.  MARK S. SAWAF's body was later presented to the medical examiner's office for

autopsy still wearing handcuffs which were further fastened to the belly chain which encircled his waist.

95.   The officers of the Lexington Police Department as well as the employees of LFUCG have a history of both not rendering aid to civilians when necessary as well as not contacting the coroner immediately, therefore the LFUCG should have been on notice of that problem. (See Estate of UMI H. SOUTHWORTH V. LEXINGTON FAYETTE URBAN COUNTY GOVERNMENT, Case Number 11-CI-02998, (Fayette Circuit Court).

96.   Although the Defendant officers present at the shooting have given drastically different statements to KSP investigators over the alleged events surrounding the shooting, to date, none of the Defendant officers have ever been required to give sworn testimony, under oath, at any judicial proceeding regarding the incident.

## COUNT I
## VIOLATION OF 6TH AMENDMENT RIGHT TO COUNSEL

97.   Plaintiff incorporates herein by reference the allegations contained in paragraphs 1 through 96.

98.   By denying MARK S. SAWAF the right to have his counsel present the date of the incident, Defendants DOBRZYNSKI, GREATHOUSE and ROBERTS deprived him of his constitutional rights guaranteed by the 6TH and 14TH Amendments of the Constitution of the United States and protected by U.S.C. Section 1983.

99.   As a direct and proximate result of being denied the right to have his counsel present, MARK S. SAWAF was subjected to various and blatant violations of his constitutional rights which would have been avoided had his counsel been present.

## COUNT II
## VIOLATION OF FOURTH AMENDMENT
## USE OF EXCESSIVE FORCE

100.  Plaintiff incorporates herein by reference the allegations contained in paragraphs 1 through 99.

101.  Assuming Defendant DOBRZYNSKI's allegation that MARK S. SAWAF did in fact attempt to grab Defendant GREATHOUSE's holstered weapon is true, MARK S. SAWAF was out numbered three to one. MARK S. SAWAF was handcuffed in front of his body and those cuffs were attached to a belly chain worn by MARK S. SAWAF which further restricted his movement. MARK S. SAWAF was lying on the ground in the fetal position when Defendant DOBRZYNSKI then shot MARK S. SAWAF once in the back of the head execution style from where Defendant DOBRZYNSKI was standing a distance of four to five feet away. Prior to shooting MARK S. SAWAF, Defendant DOBRZYNSKI did nothing to assist the other two officers present with trying to subdue MARK S. SAWAF. Defendant DOBRZYNSKI attempted no other form of non lethal means whatsoever to subdue MARK S. SAWAF.

102.  Under the circumstances described in the preceding paragraph herein above, the force used by Defendant DOBRZYNSKI was exceptionally unnecessary and excessive.

103.  By his conduct and acting under color of law, Defendant DOBRZYNSKI acted with malicious intent or at least deliberate indifference by using force that was excessive and which deprived MARK S. SAWAF of his right to be secure in his person, guaranteed by the fourth and fourteenth amendments to the Constitution of the United States and protected by Title 42, U.S.C Section 1983.

104.  As a direct and proximate result of the actions of Defendant DOBRZYNSKI, MARK S. SAWAF ultimately perished and was permanently deprived of his life and liberty.

105.    Defendant DOBRZYNSKI's use of excessive force caused or was at the very least a substantial factor in the death of MARK S. SAWAF.

106.    The acts of Defendant DOBRZYNSKI as set forth herein above were wanton, malicious and oppressive, thus entitling Plaintiff to an award of punitive damages.

COUNT III
VIOLATION OF EIGHTH AMENDMENT
& SECTION 17 OF THE KENTUCKY CONSTITUTION
CRUEL & UNUSUAL PUNISHMENT
&
ABUSE OF A PRETRIAL DETAINEE

107.    Plaintiff incorporates herein by reference the allegations contained in paragraphs 1 through 106.

108.    After MARK S. SAWAF had been shot in the back of the head by Defendant DOBRZYNSKI, Defendants DOBRZYNSKI, GREATHOUSE and ROBERTS stood by for approximately the next twenty minutes (until the arrival of ATF Medic Rebecca Bobbich) and did nothing to either assess MARK S. SAWAF for signs of life or to render him any aid whatsoever in spite of the fact it would have been obvious to even an untrained casual observer that MARK S. SAWAF was breathing and in dire need of medical assistance.

109.    By their conduct and acting under color of law, Defendants DOBRZYNSKI, GREATHOUSE and ROBERTS acted with malicious intent or at least deliberate indifference in failing to protect MARK S. SAWAF from abuse while in police custody as well as subjecting him to cruel and unusual punishment by purposefully allowing him to suffer and additionally not rendering him aid in a manner which deprived him of his rights guaranteed by the eighth and fourteenth Amendments to the Constitution of the United States, Section 17 of the Kentucky Constitution and protected by U.S.C. Section 1983, and perpetuated and exacerbated his

physical pain, suffering and condition.

110.    As a direct and proximate result of the actions of Defendants DOBRZYNSKI,

GREATHOUSE and ROBERTS herein, MARK S. SAWAF ultimately suffered, cruel and

unusual punishment, abuse, mental and physical anguish , perished and was permanently

deprived of his life and liberty.

111.    The acts of Defendants DOBRZYNSKI, GREATHOUSE and ROBERTS as set

forth herein above were intentional, wanton, malicious and oppressive, thus entitling Plaintiff to

an award of punitive damages.

COUNT IV
VIOLATION OF FIFTH AMENDMENT
& SECTION 1 OF THE KENTUCKY CONSTITUTION
DEPRIVATION OF LIFE WITHOUT DUE PROCESS

112.    Plaintiff incorporates herein by reference the allegations contained in paragraphs 1

through 111.

113.    At all times relevant hereto, Defendants DOBRZYNSKI, GREATHOUSE and

ROBERTS were acting under color of state law;

114.    As a result of the arbitrary and conscious shocking conduct of Defendants

DOBRZYNSKI, GREATHOUSE and ROBERTS described herein, MARK S. SAWAF was

permanently deprived of his life and liberty without due process of law in violation of Section 1

of the Kentucky Constitution, Amendments Five and Fourteen of the United States Constitution,

and 42 USC Section 1983.

115.    As a direct and proximate result of the violations of Section 1 of the Kentucky

Constitution, Amendments Five and Fourteen of the United States Constitution and 42 USC

Section 1983 by Defendants DOBRZYNSKI, GREATHOUSE and ROBERTS, MARK S.

SAWAF has suffered permanent deprivation of his life and liberty.

## COUNT V
## CLAIM FOR SUPERVISORY LIABILITY
## UNDER 42 USC SECTION 1983

116.    Plaintiff incorporates herein by reference the allegations contained in paragraphs 1 through 115.

117.    Defendant ROBERTS was at all times relevant hereto acting in a supervisory capacity for the LFUCG with oversight responsibility for the supervision of Defendants DOBRZYNSKI and GREATHOUSE.

118.    Defendant ROBERTS knew or should have known to instruct his subordinates, Defendant DOBRZYNSKI and GREATHOUSE to render aid to MARK S. SAWAF.

119.    Acting under color of law and pursuant to official policy, practice or custom, Defendant ROBERTS intentionally, knowingly and recklessly failed to instruct Defendants DOBRZYNSKI and GREATHOUSE to render aid to MARK S. SAWAF. Said failure to instruct and supervise directly lead to the violation of MARK S. SAWAF's rights and further contributed to his death.

120.    As a direct and proximate result of the failure of Defendant ROBERTS to instruct, supervise and control Defendants DOBRZYNSKI and GREATHOUSE as set forth herein, MARK S. SAWAF was deprived of his constitutional rights guaranteed by the various provisions of the United States Constitutions and protected by USC Section 1983 as well as permanent deprivation of life and liberty.

121.    Additionally, Defendant ROBERTS allowed Defendant DOBRZYNSKI to participate in the special detail on the date of the incident when he (ROBERTS) knew or should have known by due supervisory diligence that Defendant DOBRZYNSKI was not fit for duty due to sleep deprivation.

122. After working twenty-one and a half hours, Defendant DOBRZYNSKI had slept only two and a half to three hours before beginning his day under Defendant ROBERTS' supervision to participate in the special detail.

123. By the time Defendant DOBRZYNSKI shot MARK S. SAWAF, he had been up and working for thirty-three and a half out of the past 36 hours.

124. Further, prior to Defendant ROBERTS taking (the Lexington) team two to the sight where the shooting would later happen, The ATF supervisors, Bill Baudhuin and Rob Young, who were the supervisors over the special detail as a whole, had called off efforts for the day.

125. ATF agent Bill Baudhuin had assigned two ATF agents to the express duty of escorting MARK S. SAWAF the day of the detail to ensure his safety.

126. One of those agents, Agent Russel King, that had been assigned as security for MARK S. SAWAF, had been issued a non lethal taser as special equipment for the task.

127. One or both of the agents assigned to the security of MARK S. SAWAF, had been present at every other location with him during the day and there had been no issues of any kind regarding MARK S. SAWAF's behavior.

128. Not only did Defendant ROBERTS lead his team to the location where the shooting would later occur, he did so after the call had been made by the ATF supervisors to call efforts off.

129. Further, Defendant ROBERTS took only half the normal number of team members which DID NOT include the Agents that were assigned to MARK S. SAWAF's security.

130. Although Defendant ROBERTS advised KSP investigators he had been the supervisor of team two, he also claimed he did not know who's idea it had been to split HIS own

team up or to even go to what would be the final location (the location where the shooting would occur) after the efforts had been officially called off by the ATF task force supervisors.

131.    That Defendant ROBERTS, IS NOT VICARIOUSLY LIABLE, for the actions of Defendants DOBRZYNSKI and GREATHOUSE, but DIRECTLY liable for his direct involvement and active participation in failing to supervise them and team two.

132.    This count is intended to apply to both unnamed and unknown supervisory personnel, as well as defendant ROBERTS, if they acted in an inappropriate supervisory capacity.

133.    As a direct and proximate result of Defendan ROBERTS' failure to supervise Defendant officers, MARK S. SAWAF was deprived of his rights guaranteed by the 4th, 5th, 6th, 8th, and 14th Amendments to the United States Constitution, Sections 1 and 17 of the Kentucky Constitution as well as Kentucky Common Law resulting in MARK S. SAWAF suffering mental and physical pain, abuse, cruel and unusual punishment and permanent deprivation of life and liberty.

134.    The acts and omissions of supervisory personnel, including but not limited to Defendant ROBERTS, to control and supervise Defendant officers as set forth above were intentional, reckless, wanton, malicious and oppressive, thus entitling Plaintiff to an award of punitive damages.

COUNT VI
CLAIMS AGAINST LFUCG
FOR UNCONSTITUTIONAL PRACTICES/CUSTOMS/PRACTICES
AND/OR LFUCG'S FAILURE TO ACT/TRAIN

135.    Plaintiff incorporates herein by reference the allegations contained in paragraphs 1 through 134.

136.     The LFUCG was on notice that there was a need for more adequate training for its

emergency personnel in regards to rendering aid to individuals thought or presumed dead (see

Estate of UMI H. SOUTHWORTH V. LEXINGTON-FAYETTE URBAN COUNTY

GOVERNMENT, Case Number 11-CI-02998, (Fayette Circuit Court).

137.     In spite of Defendant LFUCG being on notice of this issue, LFUCG failed to

properly address the issue as plainly evidenced by the fact that after Defendant DOBRZYNSKI

shot MARK S. SAWAF, not one, but three employees of LFUCG stood idly by and did nothing

to assess or render aid of any kind for a period of at least twenty minutes after the shooting.

138.     Additionally, no well trained officer, inexperienced or not, would choose to

simply stand by and observe two fellow officers struggle with a prisoner for a (holstered) firearm,

as Defendant DOBRZYNSKI claims to have done, for any length of time, without offering any

assistance at all to his fellow officers. Defendant DOBRZYNSKI had an affirmative duty to

assist fellow offficers as well as to use the least amount of force possible to subdue MARK S.

SAWAF. Defendant DOBRZYNSKI failed miserably at both (because he did nothing at all but

stand and watch) due to the fact he was not well trained.

139.     Further, after failing to take any action whatsoever to alleviate the situation with

nonlethal force, Defendant DOBRZYNSKI chose to skip the entire force continuum and then

shoot MARK S. SAWAF in the back of the head. Under the circumstances, given Defendant

GREATHOUSE's pistol (the pistol MARK S. SAWAF was allegedly trying to obtain) had never

left the holster, there was two other officers there to assist and that  MARK S. SAWAF was lying

on the ground in the fetal position and in heavy restraints, Defendant DOBRZYNSKI used

absolutely unnecessary and excessive force.

140.     No well trained officer in the year 2016, would believe it was proper to stand over

top of a prisoner who was restrained and lying on the ground and then from a distance of four to five feet away shoot said prisoner under the circumstances described herein above.

141.    If Defendant DOBRZYNSKI had the luxury of having the time it took to carefully aim while standing at a distance, he certainly would have had time to have chosen ANY other of a myriad of non lethal force options, had he been well trained.

142.    Moreover, this was Defendant DOBRZYNSKI's first time EVER to assist in an out of town task force detail of this nature.

143.    Additionally, Defendant ROBERTS displayed incompetence in his ability to supervise team two as delineated in Count V herein above.

144.    Defendant LFUCG should have trained Defendant ROBERTS to better supervise subordinate, particularly considering Defendant ROBERTS was exponentially more likely to be placed in a supervisory position such as he was on the date of the incident than would an average officer.

145.    Defendant LFUCG, by and through their policy makers,. With deliberate indifference, maintained a policy, custom, or pattern of practice of promoting, facilitating or condoning improper, illegal, and unconstitutional behavior by their law enforcement officers.

146.    The harm suffered by MARK S. SAWAF was so obvious, and the failure of Defendant LFUCG to train its agents/employees or to institute a policy to avoid harm was so likely to result in the violation of constitutional rights that Defendant LFUCG can reasonably be said to have been deliberately indifferent to the need.

147.    Upon information and belief, Defendant LFUCG possessed actual knowledge indicating a deficiency with the existing policy or training (or lack thereof) such that it knew or should have known that constitutional violations such as those alleged herein were likely to

occur.

148. The need to act should have been plainly obvious to Defendant LFUCG's policy makers, who, nevertheless, were deliberately indifferent to the need.

149. Defendant LFUCG's policies, customs, patterns, practices, and/or failure to act directly and proximately resulted in depravation of MARK S. SAWAF's state and constitutional rights as well as his death.

## COUNT VII
### PARAMEDIC MALPRACTICE

150. Plaintiff incorporates herein by reference the allegations contained in paragraphs 1 through 149.

151. That Defendant DOBRZYNSKI was at all relevant times hereto, employed by Defendant LFUCG as a tactical medic.

152. That Defendant DOBRZYNSKI was, on the date of the incident, assigned to the special detail to act "strictly as a medic".

153. That as a medic, Defendant DOBRZYNSKI had an absolute duty to render aid to MARK S. SAWAF.

154. That on or about August 11, 2016, and after such time as Defendant DOBRZYNSKI had shot MARK S. SAWAF in the back of the head, that MARK S. SAWAF became a patient of Defendant DOBRZYNSKI's for the purposes of medical services, examinations, treatments, diagnoses and medical care as his condition required.

155. In rendering (or failing to render) those medical services, examinations, treatments, diagnoses and medical care for Plaintiff's decedent, MARK S. SAWAF, Defendant DOBRZYNSKI failed to exercise the degree of care and skill that would be expected of an

ordinarily prudent or reasonably competent medic or health care provider under like or similar circumstances.

156.    The failure of Defendant DOBRZYNSKI in rendering those medical services, examinations, treatments, diagnoses and medical care for Plaintiff's decedent, MARK S. SAWAF, was a substantial factor in causing personal injury to and the death of MARK S. SAWAF.

157.    As a direct and proximate result of the injuries caused to MARK S. SAWAF by the negligence of Defendant DOBRZYNSKI as set forth above, MARK S. SAWAF suffered severe physical pain and mental anguish, extreme emotional distress, loss of his ability to enjoy life, lost wages, permanent impairment of his power to earn money, funeral expenses as well as permanent deprivation of life and liberty.

### COUNT VIII
### COMPENSATORY DAMAGES

158.    Plaintiff incorporates herein by reference the allegations contained in paragraphs 1 through 157.

159.    As a direct and proximate result of the actions or failure to act of all named Defendants as set forth herein, MARK S. SAWAF suffered damages in the form of mental and physical pain and anguish, the loss of his power to earn money in the future as well as permanent deprivation of life and liberty.

### COUNT I IX
### LOSS OF FILIAL CONSORTIUM

160.    Plaintiff incorporates herein by reference the allegations contained in paragraphs 1 through 159.

161.    As a direct and proximate result of the actions or failure to act of all named

Defendants as set forth herein, ALI SAWAF has suffered damages in the form of mental and

physical pain, suffering and anguish, and the loss of love, affection, companionship and filial

consortium of his son, MARK S. SAWAF, deceased.

COUNT X

NEGLIGENCE

162.    Plaintiff incorporates herein by reference the allegations contained in paragraphs 1

through 161.

163.    As set forth herein above, all named Defendants acted or failed to act in such a

reckless, wanton and egregious manner that their conduct rises to the level of GROSS

NEGLIGENCE.

164.    As a direct and proximate result of Defendants' GROSS NEGLIGENCE, Plaintiff

is entitled to recover PUNITIVE damages pursuant to KRS 411.184 and the common law of the

State of Kentucky.

COUNT XI

WRONGFUL DEATH

165.    Plaintiff incorporates herein by reference the allegations contained in paragraphs 1

through 164.

166.    As a direct and proximate cause of the actions or failure to act of all named

Defendants as set forth herein, the Estate of MARK S. SAWAF is entitled to pursue a claim for

his wrongful death with the proceeds therefrom distributed pursuant to KRS 411.130.

WHEREFORE, Plaintiff demands as follows:

1.    Judgement in favor of the Plaintiff, ALI SAWAF, Individually, and as Administrator

for the Estate of MARK S. SAWAF, in an amount determined to be fair and rerasonable by all

evidence presented against the Defendants named herein individually and/or collectively for the

following elements of damage:

     a.    Mental and physical pain, suffering and anguish on behalf of both ALI SAWAF and MARK S. SAWAF;

     b.    Lost wages on behalf of MARK S. SAWAF;

     c.    Loss of the power to earn money in the future of MARK S. SAWAF;

     d.    Loss of love, affection, companionship and filial consortium on behalf of ALI SAWAF; and

     e.    The Wrongful Death of MARK S. SAWAF.

2.    Punitive Damages.

3.    Compensatory Damages

4.    Trial by Jury.

5.    Attorney Fees.

6.    Costs and Expenses incurred herein.

7.    Such injunctive relief regarding future police training and policy implementation or enforcement as may be determined by the Court to be appropriate.

8.    Pre-Judgment and Post-Judgment Interest where applicable; and

9.    Any such other relief as Plaintiff may appear legally and properly entitled and as the interests of justice require.

This the 13th day of October, 2017.

/s/ Douglas E. Asher II
Douglas E. Asher II
ASHER LAW OFFICE
120 South First Street
P.O. Box 1466
Harlan, Kentucky 40831
(606)273-8769

VERIFICATION

I hereby verify that the foregoing is true and accurate to the best of my knowledge and belief.

_____
ALI  SAWAF

STATE OF KENTUCKY)

COUNTY OF FAYETTE)

The foregoing was subscribed, sworn to and acknowledged before me by ALI SAWAF,

this the ___6___ day of October, 2017.

_____
NOTARY PUBLIC
STATE AT LARGE

My Commission Expires: ___JUNE  22, 2021___

My Notary I.D. Number: ___579081___

SEAL: